**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

PRENTISS GRIFFIN,
     *Petitioner-Appellee*,

v.

KELLY HARRINGTON, Warden,
     *Respondent-Appellant.*

No. 12-57162

D.C. No.
2:10-cv-08753-
VBF-SP

OPINION

Appeal from the United States District Court
for the Central District of California
Valerie Baker Fairbank, District Judge, Presiding

Argued and Submitted
June 6, 2013—Pasadena, California

Filed August 16, 2013

Before: Stephen S. Trott, Carlos F. Lucero,[*]
and William A. Fletcher, Circuit Judges.

Opinion by Judge Trott

---

[*] The Honorable Carlos F. Lucero, Circuit Judge for the U.S. Court of Appeals for the Tenth Circuit, sitting by designation.

## SUMMARY[**]

### Habeas Corpus

The panel affirmed the district court's grant of a 28 U.S.C. § 2254 habeas corpus petition challenging a murder conviction based on ineffective assistance of counsel.

Although trial counsel knew that the only witness who would identify petitioner as the shooter had decided to change his testimony, counsel did not object when the witness took the stand and answered questions on direct and cross examination, all without taking an oath. Determining that counsel's failure to object constituted a waiver, the trial court denied a subsequent objection to introduction of the witness' taped, inculpatory statement to the police. The panel held that the California Court of Appeal's conclusion, that counsel's failure to make a timely objection was tactical and not error, was objectively unreasonable and unsupported by the factual record.

### COUNSEL

Shira B. Seigle (argued), Deputy Attorney General, Kamala D. Harris, Attorney General of California, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Jason C. Tran, Deputy Attorney General, Los Angeles, California, for Respondent-Appellant.

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

Marilee Marshall (argued), Marilee Marshall & Associates, Los Angeles, California, for Petitioner-Appellee.

## OPINION

TROTT, Circuit Judge:

Petitioner Prentiss Griffin, a member of the Grape Street Crips gang, was convicted by jury in the Superior Court of Los Angeles County of the first degree murder of Dwin Brooks, a member of a rival gang, the Bounty Hunter Bloods. The jury acquitted him of shooting Waylon Walton, who was shot but not killed during the same encounter. His sentence was 90 years to life. On direct appeal, the California Court of Appeal affirmed his conviction, reduced his sentence to 80 years to life, and subsequently denied his petition for a writ of habeas corpus. The California Supreme Court denied review.

Griffin then filed a petition for a writ of habeas corpus in the Central District of California pursuant to 28 U.S.C. § 2254. The district court granted the petition, concluding that Griffin had been the victim of ineffective assistance of trial counsel as guaranteed by the Sixth Amendment; and that California's Court of Appeal's application of the *Strickland v. Washington*, 466 U.S. 668 (1984), standard was unreasonable. 28 U.S.C. § 2254(d)(1). The district court further concluded that the Court of Appeal's factual findings in support of its decision were unreasonable under § 2254(d)(2). We have jurisdiction over this timely appeal pursuant to 28 U.S.C. § 1291, and we affirm.

# I

## FACTS AND CIRCUMSTANCES

On March 5, 2005, someone shot and killed Dwin Brooks during a confrontation in Los Angeles, California, involving rival street gangs during which at least forty bullets were fired from four different firearms.  Some nine months later, Fred Wilberger, then a federal prisoner, told a Los Angeles police detective that the shooter was Prentiss Griffin.  The detective recorded Wilberger's statement.  Largely on the basis of that statement, Griffin was arrested and charged with Brooks's murder.  Wilberger was the only person who claimed to be able to identify Griffin as the person who shot Brooks.

By the time of Griffin's trial, however, Wilberger had decided to change his story.  Before the prosecution called him as a witness, Griffin's attorney, Simon Aval, was aware of Wilberger's about-face.  Aval also knew that given Wilberger's decision to repudiate his prior inculpatory statement, the jury would most likely hear the recording of it for the truth of the matter asserted pursuant to Cal. Evid. Code §§ 770, 785, and 1235.

As predicted, the trouble began the moment Wilberger took the stand.  Here, we borrow from Magistrate Judge Pym's thorough Report and Recommendation to the district court.

> The clerk told Wilberger to raise his right hand and read him the oath.  Silence apparently followed because the clerk then said, "I need a response, an answer."

Wilberger said, "No." The trial judge thereafter removed the jury from the courtroom and addressed the witness. The following dialogue ensued:

Trial Judge:    You have been told to swear to tell the truth.  Do you understand that?

Wilberger:      Yes, Ma'am.

Trial Judge: How old are you?

Wilberger:      24.

Trial Judge:    So you're old enough to know what the truth is, right?

Wilberger:      Yes, Ma'am.

Trial Judge:    All right.  We're going to proceed with your testimony.  Do you understand that?

Wilberger:      Yes, Ma'am.

The trial judge then instructed the prosecutor to take Wilberger as a hostile witness and proceed with questioning.

Direct examination commenced. Petitioner's trial counsel did not object prior to the direct examination of Wilberger.  On direct examination by the prosecutor, Wilberger answered every question, but

denied all knowledge of petitioner and the shooting, and also denied having ever identified petitioner to the police. Petitioner's counsel cross-examined Wilberger with just two questions: had he ever seen petitioner before, and had he seen petitioner on March 5, 2005. Wilberger answered "No" to both questions and was excused as a witness.

The following morning before the jury was brought out, the trial court discussed with counsel the recording of the conversation between Wilberger and Detective Weber, the police detective who conducted the interview where Wilberger identified petitioner as the shooter, ordering that a portion of it be deleted. The prosecutor said she planned on playing the tape by recalling Detective Weber the following morning, since she needed time to edit the tape and Detective Weber was already ready to take the stand that morning.

The examination of Detective Weber commenced. Without explanation for the change in schedule, the prosecutor asked the detective about his interview with Wilberger to begin laying the foundation to introduce the tape. Cal. Evid. Code[] § 1235. At this point, petitioner's counsel asked to go on record at sidebar. Petitioner's counsel said, "I just want to object for the record for the tape coming in because Mr. Wilberger didn't give us any sworn testimony yesterday." The prosecutor was flummoxed by the objection, saying she

did not know the law in this area and that the objection was not something she expected from counsel. The prosecutor asked first if she could take a recess to research the law on point and second whether Mr. Wilberger could be recalled to re-administer the oath to him. The trial court denied the request to recall Mr. Wilberger, as the trial court was skeptical that Wilberger would then take the oath when he previously refused, and stated it would not recall Wilberger unless the prosecutor knew he would take the oath.

Following a recess, the prosecutor argued and the trial court agreed that petitioner's counsel had waived the objection by not objecting immediately and by conducting a cross examination. As part of this discussion, both the trial court and the prosecutor pointed out that petitioner's counsel made no previous objections to the oath-taking, and petitioner's counsel did not dispute this, although he did dispute the legal conclusion that this amounted to a waiver of the objection. Evidence of Wilberger's statement to the police was then put in evidence. In that taped statement, Wilberger told detectives that he saw the shooter, he thought the shooter's name was "Prentiss," and he believed the shooter could be either of two persons in a poor-quality photo six pack he was shown.

## II

## GRIFFIN'S DIRECT APPEAL

Prentiss was convicted.  On appeal, the California Court of Appeal affirmed his conviction.  The court said,

> Every witness is required to take an oath, or affirm, that he will testify truthfully.  (Evid. Code[] § 710).  It is not unconstitutional to receive unsworn testimony in evidence, but if a timely objection is made on that ground, the testimony is not evidence within the meaning of the Evidence Code.  (*In re Heather H.* (1988) 200 Cal. App. 3d 91, 95–96.)

Focusing on Aval's failure timely to object to Wilberger's testimony, the court refused to consider Griffin's claims (1) that trial counsel's objection to Wilberger's testimony was indeed timely, and (2) that his prior inculpatory statement to the police was therefore inadmissable.  The court said, "Because defense counsel did not object to Wilberger's testimony due to the oath taking issue but instead went on to cross-examine him, any objection to Wilberger's testimony was waived. . . . Because Wilberger's unsworn testimony became evidence due to this waiver, it necessarily follows that impeachment of that evidence was allowable."

The court left for another day Griffin's *Strickland* attack on the performance of his trial counsel.

## III

## GRIFFIN'S STATE HABEAS PETITION

When that day came, the Court of Appeal denied Griffin's state petition, albeit in a divided opinion. The majority concluded that Aval "had a credible tactical reason for failing to object" to Wilberger's testimony. The majority determined that "Aval knew he was waiving his objection but elected to cross-examine Wilberger in order to obtain the advantages or avoid the ill effects described in his declaration." The majority also said, "We must accord Aval's tactical decision great deference in order to avoid second-guessing counsel's tactics and chilling vigorous advocacy by tempting defense counsel to defend themselves rather than their clients during trial." The majority further speculated that Aval must have believed that "a well-timed objection and motion to strike would have ultimately resulted in Wilberger stating the final words necessary to constitute the taking of the oath."

In dissent, Justice Flier saw Aval's failure to object not as a reasonable tactical decision, "but an error," a conclusion Justice Flier believed to be "objectively supported by the record." She also said,

> Aval knew that Wilberger was a reluctant witness and that he was likely to recant his statements to the police. There is no doubt that Aval knew that the prosecution was ready for this and could impeach Wilberger with a prior inconsistent statement. Given these hard facts, if there was a lawful way of preventing Wilberger from testifying, defense counsel had to act to accomplish that objective. An

appropriate, lawful and unimpeachably correct objection to Wilberger's testimony was his refusal to testify under oath.

The majority concludes that the record indicates that Wilberger was close to agreeing to take the oath and that the record "can reasonably be construed as at least indicating Wilberger's assent to the oath." Neither of these conclusions is borne out by the record. In the first place, Wilberger flatly refused to take the oath and there is nothing to indicate that he ever entertained changing his mind. Secondly, the fact that he admitted in response to the court's question that he was old enough to know what the truth is reveals nothing about his state of mind. It is very hard to imagine that anyone would have answered that question differently, especially when the question is asked by a judge, and the answer is therefore completely neutral and devoid of content or significance. Certainly, hard upon the heels of that answer came the court's flat statement that "[w]e're going to proceed with your testimony," which means that there was no attempt to discover what Wilberger's state of mind was, other than that he refused to take the oath as a witness. In other words, the only significant fact revealed by the record is that Wilberger unequivocally refused to take the oath and nobody tried to change his mind.

# IV

## FEDERAL HABEAS STANDARDS

The Antiterrorism and Effective Death Penalty Act ("AEDPA") mandates that federal habeas relief

> [s]hall not be granted with respect to any claim that was adjudicated on the merits in state court proceedings unless the adjudication of the claim —
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings.

28 U.S.C. § 2254(d).

This statute limits our authority to grant a federal writ by establishing two "highly deferential" standards. *Premo v. Moore*, 131 S. Ct. 733, 740 (2011). "The pivotal question is whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Harrington v. Richter*, 131 S. Ct. 770, 785 (2011). Thus, a state court's determination that a claim lacks merit bars federal habeas relief so long as "fairminded

jurists could disagree" on the state court's decision. *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004). Moreover, to grant a habeas petition under § 2254(d)(2), a state court's factual findings must be "clearly erroneous," not just merely debatable. *Torres v. Prunty*, 223 F.3d 1103, 1107–08 (9th Cir. 2000). These stringent standards "guard against extreme malfunctions in the state criminal justice systems, not as a substitute for ordinary error correction through appeal." *Richter*, 131 S. Ct. at 786 (internal quotation marks omitted).

## V

## ANALYSIS

Although we review de novo the district court's decision, we conclude it was correct. We have no doubt from the record and from Aval's declaration that he knew during Wilberger's testimony that his statements in court — in Aval's words — "were made without any oath [and] could not technically be considered evidence." What Aval did *not* know and what he did *not* comprehend under settled state law, however, was that by failing timely to object to that testimony in combination with conducting cross-examination, he was waiving *any* objection he might have had to Wilberger's testimony. The dire consequences of his ignorance on this point was first, that Wilberger's prior inconsistent inculpatory statement then became admissible against his client; and second, that his client would be barred on appeal from raising any issue related to Wilberger's sworn testimony. We repeat the California Court of Appeal's holding on direct appeal: "Because defense counsel did not object to Wilberger's testimony but instead went on to cross-

examine him, any objection to Willberger's testimony due to the oath taking issue was waived."

Thus, by waiting to object until after Wilberger had been excused as a witness, and until the next day, Aval unwittingly sealed his client's fate, both at the trial and on appeal. He subsequently admitted that his failure immediately to object was a mistake because he thereby failed "to preserve the question for Mr. Griffin's appeal."

Defense counsel's egregious error in failing timely to block Wilberger's "testimony" and thus his prior inculpatory statement was aggravated by counsel's knowledge going into the case that Wilberger would most probably recant the statement, leaving his prior statement as the only evidence in the case identifying Griffin as Dwin Brooks's killer. Thus, by not making a timely objection to Wilberger's testimony, Aval lost any opportunity to protect his client against the only evidence that named him as Brooks's killer. In effect, his failure inured to the benefit of the prosecution by erasing a serious impediment in its plan to use Wilberger's prior statement.

Accordingly we conclude that the California Court of Appeal's conclusion that Aval's decision not to object in a timely fashion was acceptably tactical and not error was objectively unreasonable. It is one thing to devise a litigation tactic that fails. That is a common occurrence in the courtroom. It is wholly another matter to devise a tactic without realizing not only that it cannot work, but that it will result in permanently depriving your client of the one opportunity he has to render inadmissable the prosecution's only direct evidence linking him to the murder with which he is charged. With all respect, the state court's strained

reasoning runs afoul of the Supreme Court's warning that courts should "not indulge [in] *post hoc* rationalization for counsel's decisionmaking that contradicts the available evidence of counsel's actions." *Richter*, 131 S. Ct. at 790 (internal quotation marks omitted). The Court of Appeal's ruling was "beyond any possibility for fairminded disagreement." *Id.* at 787.

To add injury to injury, the damaging effect of trial counsel's waiver at trial has now carried over into his client's federal habeas proceedings, blocking him from raising substantial federal constitutional issues. We refer again to Magistrate Judge Pym's report:

> Because petitioner's trial counsel waived his confrontation right by failing to timely object to Wilberger's unsworn testimony, petitioner is not entitled to habeas relief based on his Confrontation Clause challenge. And given the absence of a confrontation violation, there is no basis for the court to find a due process violation either. Put simply, the admission of this unsworn testimony – without any objection to its admission from either counsel, and thus not in violation of either California evidentiary rules or the Confrontation Clause – did not render the trial fundamentally unfair. And at a minimum, given the absence of any objection prior to the admission of Wilberger's testimony, this court does not find that the California courts unreasonably applied controlling Supreme Court law or unreasonably determined the

facts in implicitly rejecting petitioner's due process claim.

The predictable fallout from counsel's error could hardly have been more catastrophic.

## VI

## THE COURT OF APPEAL'S FACTUAL FINDINGS

We are fully convinced that the California Court of Appeal's factual determinations weighing on this issue were plainly unsupported by the record and thus demonstrably and clearly erroneous. The majority of the Court of Appeal in concluding that Aval's decision not to object was a valid tactic opined that Aval believed that a timely objection to Wilberger's unsworn testimony would "have ultimately resulted in Wilberger stating the final words necessary to constitute the taking of the oath." Aval did not so state in his declaration, and the factual record simply does not support such speculation.

Furthermore, the record suggests that the prosecutor, Ms. Brako, may have attempted to call Wilberger back to the stand to take the oath, but that he refused. This according to the trial transcript is what happened.

> Ms Brako:    *Well, I understand Mr. Wilberger is still in custody, and I'd ask the court to bring him back out.*
>
> The Court:    For what reason? He's already refused to testify. As far as I know, he was let go.

Ms. Brako:      Well, he was released *but he's still in custody*.  He was released from this court's proceeding.

The Court:      Do you have any reason to believe he's going to take the oath?

Ms. Brako:      *Well, we can administer it again.  I mean, I'm asking the court for a brief recess in this instance to do that*.  He did testify.  He was given the oath.

The Court:      *I'm not bringing him up unless you know he's going to take the oath*.  That's number one.  Number two, you have to find out what the law is.

Ms. Brako:      I understand that.  I wasn't prepared for that objection.  Counsel just brought this up at side bar midway through.  He didn't indicate that's what he was going to do.

(Emphasis added).

The court then took a recess.  When court resumed, the prosecutor did not have Mr. Wilberger in tow, or renew her request that he be brought back to the courtroom, deciding instead to argue waiver.  Her argument was successful, and Wilberger's prior statement was placed before the jury.

These events markedly undercut the Court of Appeal's speculation that if pushed Wilberger might well have acceded to the oath.  It is more probable that the prosecutor did not ask

to bring him back to the courtroom because, as the court said to her, "I'm not bringing him up unless you know he's going to take the oath." The record suggests he was pushed but did not move.

Equally unsupported by the factual record is the Court of Appeal's finding that Aval "knew he was waiving his objection . . . ." With the utmost respect to our state court colleagues, the record supports the opposite conclusion, i.e. that Aval simply did not understand the consequences of his choice. His decision to cross-examine Wilberger to get him to acknowledge what he had already said paved the way for his damning statement.

In any event, as we have explained in Part IV, even if the Court of Appeal's unsupportable speculation about what Aval believed was correct, such a belief on counsel's part would nonetheless amount to ineffective representation well below the *Strickland* standard because it was not informed by the legal consequences of doing nothing: waiver. Because of the potential for waiver, he did not have the option he thought he had of remaining silent until the next day, a consequence overlooked by the Court of Appeal in its analysis, an oversight which renders that analysis unreasonable.

## VII

### PREJUDICE

The Court of Appeal then assumed, "for discussion's sake only that Aval's failure to object was not reasonable . . . ," noting that Griffin nevertheless was still "obliged to prove by a preponderance of the evidence that a more favorable outcome was reasonably probable had a timely objection been

made." The court concluded that Griffin had failed to carry his burden of proof on this issue because "[a]s noted above, the trial court came close to having Wilberger acknowledge his obligation to testify honestly. That fact alone tilts the scale in favor of a conclusion that Wilberger would have taken the oath had the court phrased its inquiry more precisely."

With all respect to the Court of Appeal's majority, the factual record contradicts its scale-tilting "fact" that Wilberger would have mouthed acceptance of the oath if he had been pushed. As the Court of Appeal's dissenter correctly observed, "[i]n the first place, Wilberger flatly refused to take the oath and there is nothing to indicate that he ever entertained changing his mind. Secondly, the fact that he admitted in response to the court's question that he was old enough to know what the truth is reveals nothing about his state of mind."

In their opinion, the court majority accused Griffin of asking them "to speculate" that Wilberger would have persisted in refusing to take the oath. However, it was the Court of Appeal majority — not Griffin — that indulged in speculation in the face of strong evidence to the contrary. Certainly the trial judge did not believe he would agree to the oath. Moreover, notwithstanding the prosecutor's request to bring him back to the courtroom, she did not do so after the court told her not "unless you know he's going to take the oath." Accordingly, we conclude that the factual record more than adequately supported Griffin's position, and that the court's finding — as previously discussed in Part VI of this opinion — was clearly erroneous and objectively unreasonable.

As a fall back position, the Warden now argues that the People's evidence against Griffin was such as to support his conviction "even had an objection led to the complete exclusion of Wilberger's testimony and his prior inconsistent statement." We emphatically disagree. It is as simple as this: Wilberger's disclaimed prior inconsistent statement constitutes the only evidence in the prosecution's case that "Prentiss" was the shooter. Without this evidence, the prosecution had little other than (1) Griffin's presence at the scene, (2) a possible motive arising out of his membership in a rival gang, and (3) his access to a firearm. That's it. This evidence might serve as corroboration of Wilberger's statement, but standing along, it could not support a guilty verdict. Brooks's girlfriend, Nartrella Williams, put Griffin at the shooting, but she did not see Griffin with a gun that night, much less see him shoot one at anyone, including her boyfriend. She told the police that "[m]ore than one person was shooting." By the time of the trial, she did not believe Griffin shot Brooks. Neither did Georgetta Chevalier, another witness to the gunfire. She named others whom she saw firing guns, including "Diamond, Tweeter, and Doodles or Little One," but said that Griffin was not one of the shooters she saw. Waylon Walton, also shot at the scene, was certain that he did not see Griffin the night of the attack. Here, we note that the prosecution did not rely on a theory that Griffin aided and abetted whomever might have fired the fatal shot, choosing instead to go after him directly.

On top of these glaring deficiencies in the prosecution's case, no physical evidence linked Griffin to the crime. A criminologist eliminated a gun he was carrying when he was arrested as one of the guns fired the night of the shooting.

Not only do we conclude that there is a reasonable probability that the jury would have come to a different conclusion without Wilberger's recorded statement, but because the prosecution's case was so weak without Wilberger, we doubt that Griffin would have been charged with the murder in the first place. After all, a year went by after the shooting before Griffin was charged. What was it that caused Griffin's arrest? Wilberger's statement taken almost nine months after the murder. Before Wilberger's statement to Detective Weber, Weber testified that Griffin had not even been identified as a possible suspect: "I remembered . . . [that] there was a Prentiss in the book, but I had really not looked at Prentiss." As the media frequently says, Wilberger was the prosecution's "star witness," at least in what he said to Detective Weber, if not on the stand.

Finally, the prosecution makes much about an ambiguous statement Griffin made after his arrest that he thought he was being taken to a police station near where the murder occurred. The prosecution tries to stretch this utterance into an admission of guilt, but the inference the prosecution asks us to draw is not reasonable in the absence of Wilberger's testimony.

## VIII

### CONCLUSION

In summary, under state law, Aval's *only* viable move was to lodge a timely objection to Wilberger's testimony. Aval did not have the option of proceeding with cross-examination and then waiting until the next day to try to block Wilberger's prior statement. The proof of this sour pudding came in the form of the trial court's adverse ruling

when he did object to Wilberger's statement, and then the Court of Appeal's decision affirming his client's conviction on the ground that Aval was required to object but did not. To quote again from Magistrate Judge Pym's report,

> Confrontation Clause rights may be waived by the actions of counsel alone. In some circumstances, a deliberate waiver by counsel of these rights would be a sound tactical decision. But it is not reasonable under prevailing professional norms to unwittingly waive a defendant's core constitutional rights [of confrontation], as apparently happened here. And given what was at stake with the failure to object in this instance, it could not have been a reasonable tactical decision.

We are mindful from experience how difficult it is to resolve in court the mayhem caused in our cities by gangs. Also, we do not overlook Griffin's prior record for violence, a record that explains the severity of his sentence. Nevertheless, gang members, like everyone else, are entitled under our Constitution to effective representation of counsel.

**AFFIRMED.**