IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| In the Matter of the Personal Restraint of | ) | No. 31955-5-III |
| | ) | |
| KEVIN LEE HILTON, | ) | |
| | ) | |
| Petitioner. | ) | UNPUBLISHED OPINION |
| | ) | |

SIDDOWAY, C.J. — Kevin Hilton seeks relief from personal restraint in the form of a life sentence without the possibility of parole imposed for his 2008 Benton County conviction of two counts of aggravated first degree murder in the shootings of his landlords Lawrence and Josephine Ulrich. Mr. Hilton was originally convicted of the murders in 2003. Those convictions were reversed on appeal when this court ruled that incriminating gun shell evidence and other items including computers were seized from Mr. Hilton's home pursuant to an invalid search warrant. *See State v. Hilton*, 131 Wn. App. 1020 (2006), *review denied*, 158 Wn.2d 1027 (2007).

After he was again convicted on retrial, Mr. Hilton filed a direct appeal and this court affirmed the judgment and sentence. *See State v. Hilton*, 164 Wn. App. 81, 261 P.3d 683 (2011), *review denied*, 173 Wn.2d 1037 (2012). This timely petition follows.

No. 31955-5-III
*In re Pers. Restraint of Hilton*

Mr. Hilton, who is represented by counsel, raises four grounds for relief in this

petition: (1) the State violated due process under *Brady v. Maryland*, 373 U.S. 83, 87, 83

S. Ct. 1194, 10 L. Ed. 2d 215 (1963), by failing to provide the defense with material

exculpatory evidence before trial; (2) he was denied due process by the State's knowing

presentation of, and reliance on, false and misleading evidence to the jury; (3) he was

denied effective assistance of counsel; and (4) he was denied his constitutional right to

present a defense when the court prohibited him from presenting evidence that the

victims' daughter, Lisa Ulrich, was the real killer.

Mr. Hilton has filed a companion motion to disqualify the Benton County

prosecutor and members of his office from representing the State in this petition and any

potential reference proceedings, as well as a motion for discovery and for an evidentiary

hearing. The petition and motions were referred to this panel for determination. RAP

16.11(b).

We deny Mr. Hilton's motions and dismiss his personal restraint petition.

FACTS

The facts are largely repeated from the appeal opinion, with additions as relevant

to the claims raised in this petition.[1] The Ulrichs' adult daughter Lisa discovered her

---

[1] We granted a motion by Mr. Hilton to incorporate the record from the second direct appeal, cause no. 26899-3-III, into this petition; citations to a report of proceedings are to the report of proceedings for that appeal.

2

parents' bodies in their Richland home shortly after 9:00 a.m. on March 21, 2002. Both had been shot at close range by a .45 caliber weapon. There was no sign of forced entry to the home. Their wallets were missing. Detectives found three .45 caliber "A-Merc" brand shell casings at the murder scene that a firearms expert determined were all fired from the same gun. Five .45 caliber bullets were recovered—three from the murder scene within the home and two from Josephine Ulrich's body. The other two shell casings were never found.

Officers and a paramedic who responded to the scene observed a partial boot or shoe print in grease and several bloody partial shoeprints leading from a pool of blood on the carpet about five feet inside the home's tile entryway. The victims' bodies were visible from the entryway. Lisa Ulrich testified she took only one step inside the door and saw the bodies and did not go further inside, although physical evidence indicated further entry may have been necessary to see the bodies.

The Ulrichs lived alone and were last seen alive in their home on the evening of March 20 when Lisa and her children visited. They arrived around 4:30 p.m. and left between 5:30 and 6:00 p.m., when the Ulrichs were about to eat dinner. Autopsies revealed that the victims died from gunshot wounds inflicted within a few minutes to three hours after they ate dinner.

The Ulrichs were longtime landlords and owned seven rental properties. One of their tenants was Kevin Hilton, who lived 1.6 miles away. Affixed to Mr. Ulrich's hand

when his body was discovered was a yellow sticky note folded to conceal an original rent receipt dated March 20. The receipt, signed by Josephine Ulrich, was made out to Kevin Hilton in the sum of $3,475, representing the exact total of his several months' delinquent rent. The receipt book was never found. The sticky note concealing the receipt remained in Larry Ulrich's hand despite blood evidence showing his body was dragged 10 to 12 feet by the murderer.

A telephone handset with caller ID was missing from the kitchen, close to where the bodies lay. It was never found. Another caller ID box was kept upstairs. It showed that the last call on March 20 was from Kevin Hilton at 6:42 p.m. A file folder on top of the refrigerator contained an original three-day pay rent or quit notice prepared to Mr. Hilton by Josephine Ulrich on March 15, 2002.

Lisa Ulrich and her sister Jennifer (who lived out of state at the time of the murders) were familiar with their parents' practices when accepting rent payments. Their mother would typically issue a receipt only to renters making a cash payment in person. Those paying by check received a receipt only if they asked for one. In most cases if a renter wanted a receipt they would come to the Ulrichs' house and drop off the payment. Jennifer and Lisa both testified that the receipt book currently in use was kept openly on top of the refrigerator.

Police were able to contact all of the Ulrichs' tenants on March 21 except for Mr. Hilton. Officers finally spoke with him at his home the next day. Asked about his

whereabouts on the night of the murders, he told officers he had shopped for groceries at WinCo, returned the book *Hard Time* to the Richland library, and then played volleyball at Hanford High School from 8:30 to 10:30 p.m. He told them he owed the Ulrichs $3,475 in back rent, but had reached a payment arrangement with them by telephone on the evening of the murders. He said he telephoned the Ulrichs between 6:00 and 6:30 p.m. that day and they left a return message between 7:00 and 7:15 p.m. while he was out. He said they agreed to his proposal for paying back rent. He said he erased the message.

When asked about firearms, Mr. Hilton said he owned three rifles and showed them to the officers. They noticed ammunition boxes, shell casings and reloading equipment in his basement. He denied currently owning any handguns but described four that he owned in the past, including two .45 caliber Norinco handguns. He had participated in competitive shooting events in the past. He said he sold one Norinco to Dirk Leach and the other to an unnamed individual at a Walla Walla gun show 6 or 8 months before March 22. Police were only able to trace the gun sold to Mr. Leach, and testing showed it was not the murder weapon. *See State v. Hilton*, 164 Wn. App. 81, 86 n.3, 261 P.3d 683 (2011). When asked where he was on March 21, Mr. Hilton said he went to Mattawa (about 51 miles from Richland along the Columbia River) to sell primers to a guy, "VC," whose address and telephone number he did not have.

5

On March 25, a detective recovered an envelope from the mail addressed to Larry Ulrich from Mr. Hilton's return address that was postmarked March 21, 2002. The envelope contained a promissory note from Mr. Hilton dated March 19, 2002, stating he would pay the Ulrichs $2,000 plus interest on or before September 1, 2002. The envelope also contained a letter to Larry Ulrich dated March 20, thanking him for his understanding and summarizing that Mr. Hilton owed $3,475 in back rent and penalties, $2,000 would be paid by note, and the $1,475 balance would be satisfied by work credit at $12 per hour.

Jennifer Ulrich testified that her father had allowed renters, including Mr. Hilton, to work for credit. But both Ulrich sisters testified that based upon their knowledge of their parents' rental practices, they would not have made the type of agreement written up by Mr. Hilton. Both sisters doubted they would allow Mr. Hilton to, in essence, stay another six months rent free when he already owed them $3,400.

The police investigation uncovered only one gun shop (Schoonie's Rod Shop in Benton City) and no other retailer or gun show seller in the area that stocked the very uncommon "A-Merc" brand of .45 caliber ammunition between 1994 and 2002. Schoonie's' owner Barbara Schoonover testified she stocked a total of 74 boxes during that time period and kept all sale and purchase records. She sold Mr. Hilton 28 of those boxes in May-June 1994, as well as a .45 caliber Norinco handgun. She was certain that

the shell casings found in the Ulrichs' home bore the same head stamp and were the same kind of .45 caliber "A-Merc" ammunition that she sold Mr. Hilton.

Evidence was introduced at trial that Mr. Hilton did not appear on the WinCo store's video system showing everyone who entered or exited the building on March 20. Library records also showed that Mr. Hilton had returned *Hard Time* on March 19 (not March 20), and that he next used the library on March 21, when he returned two books and checked out another book. His volleyball teammates confirmed he arrived right at the 8:30 p.m. start time, which was late for him because he typically arrived about 15 minutes early to warm up. He told his teammates he had to clean up garbage that spilled in his kitchen so his cat wouldn't get into it.

Evidence was introduced that the most recent gun show in Walla Walla had taken place 14 months before the killings, not 6 to 8 months earlier as claimed by Mr. Hilton. With regard to Mr. Hilton's claimed Mattawa trip, law enforcement authorities throughout the region could not identify anyone using the name "VC."

The parties presented conflicting expert testimony on whether Mr. Hilton's size 12½-13 feet could have fit into the shoes that left the partial bloody footprints. The State's forensic scientist opined based on a footprint taken from Mr. Hilton that his foot could have fit inside the shoe that made the prints.

The defense presented testimony from Donald Short, president of Mr. Hilton's Internet provider. During this testimony, the court admitted evidence showing the

following times of Internet usage on Mr. Hilton's computers on the evening of March 20,

2002:

>5:42:12 - 5:59:17 p.m.
>6:20:13 - 6:20:31 p.m.
>7:41:32 - 7:41:42 p.m.
>7:58:35 - 8:10:24 p.m.
>10:41:17 - 10:45:36 p.m.

Ex. 490. While Mr. Short testified that the Internet was in use at Mr. Hilton's residence

at these times, he acknowledged on cross-examination that he could not say for certain

that a human was doing it "because you can automatic such a thing." Report of

Proceedings (RP) (Feb. 7, 2008) at 3261. He explained, "If you set your email to check

periodically, especially on a dial-up connection, it can dial it in, do its thing, and then

eventually it will time out." *Id.* Defense lawyers asked Mr. Short on redirect about the

short logons for 8 seconds at 6:20 p.m. and 10 seconds at 7:41 p.m., and Mr. Short

testified that they were most likely human contact, such as an inadvertent click onto the

Internet or a quick logon to check e-mail, whereas an automated logon would take longer.

He was never asked if the 7:58:35 to 8:10:24 p.m. access was most likely human contact

or automated.

Mr. Hilton did not testify at the first trial, but took the stand in his second trial and

denied killing the Ulrichs. He gave alibi testimony as to his whereabouts on March 20.

He claimed he went to Albertsons at about 7:00 p.m., then bought gas at a Conoco

station, and then went to the library shortly after 7:30 p.m. and returned two paperbacks.

He denied telling officers that he went to WinCo, but admitted he did not tell them he went to Albertsons. He corrected his original statement about his stop at the library, testifying that he went just inside the doors to the paperback racks for only a few seconds and returned two books. He claimed that his original statement to a detective on March 26, that he returned *Hard Time* on March 20, was his best guess at the time, but he later realized he was mistaken about the date.

He claimed to have returned home and spent time on the computer before volleyball. He admitted that he never mentioned the spilled garbage that delayed his arrival at volleyball to detectives because the topic never came up and he considered it unimportant.

He claimed that he and Josephine Ulrich discussed his payment proposal for the rent arrears during the 6:42 p.m. call showing on the Ulrichs' upstairs caller ID. His earlier statement to the police that he had called between 6:00 and 6:30 p.m. was just an estimate. He claimed that he never received a 3-day notice from Ms. Ulrich. His letter describing the payment plan was mailed to the Ulrichs with a promissory note on March 21.

Mr. Hilton further testified that he owned no handguns at time of the murders. He admitted to buying "A-Merc" ammunition and a .45 caliber Norinco handgun from Barbara Schoonover years earlier. Mr. Hilton held a yard sale a month after the murders, on April 26, 2002. As bearing on Mr. Hilton's credibility, a State's witness testified that

9

he purchased a .45 caliber handgun and a .22 caliber rifle at that yard sale. The witness positively identified Mr. Hilton in court as the seller of the guns, although it was later shown in expert firearms analysis that the .45 caliber was not the murder weapon. Mr. Hilton denied selling any gun at his April 26 yard sale. He said he sold his last .45 caliber handgun at a gun show in Walla Walla in February 2001 and explained that he had previously only estimated that the gun show was six to eight months earlier. He was unable to describe the purchaser of the gun in his initial trial testimony, but when he resumed the stand the next day, he described the person as a white male with brown hair who was shorter and more slightly built than him. He admitted that the Ulrichs only gave him a receipt when he showed up in person and paid his rent in cash.

The jury disbelieved Mr. Hilton's alibi defense and found him guilty of the murders. Other facts will be related as pertinent to the resolution of Mr. Hilton's claims.

## ASSERTED GROUNDS FOR RELIEF

### *Personal Restraint Petition Review Standards*

To obtain relief in a personal restraint petition (PRP), Mr. Hilton must show actual and substantial prejudice resulting from alleged constitutional errors, or for alleged nonconstitutional errors a fundamental defect that inherently results in a miscarriage of justice. *In re Pers. Restraint of Cook*, 114 Wn.2d 802, 813, 792 P.2d 506 (1990). To avoid dismissal, the petition must be supported by facts and not merely self-serving or conclusory allegations. *Id.* at 813-14. The supporting evidence must be based on "more

10

than speculation, conjecture, or inadmissible hearsay," and a failure to meet this burden calls for dismissal of the petition. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 886, 828 P.2d 1086 (1992).

### *Ground 1:* Brady *claim*

Mr. Hilton contends the State violated his right to due process under *Brady*, 373 U.S. 83, by failing to provide the defense with material exculpatory evidence before trial, that being materials pertinent to usage of the Ulrichs' computers on the night of the murders.

Under *Brady*, the prosecution has an affirmative duty to disclose evidence that is favorable to a defendant. *Brady*, 373 U.S. at 87; *Kyles v. Whitley*, 514 U.S. 419, 432, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995). "[T]here are three components of a true *Brady* violation: [t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *In re Pers. Restraint of Stenson*, 174 Wn.2d 474, 486-87, 276 P.3d 286 (2012) (quoting *Strickler v. Greene*, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 144 L. Ed. 2d 286 (1999)). With respect to the third component, the "materiality of the evidence" and "prejudice" are spoken of interchangeably. *Stenson*, 174 Wn.2d at 487. To prove materiality, a petitioner must show "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* (internal quotation

11

marks omitted) (quoting *Kyles v. Whitely*, 514 U.S. at 433-34). A *Brady* violation is shown when "[t]he favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." *Kyles*, 514 U.S. at 435; *Stenson*, 174 Wn.2d at 487. But if the defendant using reasonable diligence could have obtained the information, there is no *Brady* violation. *State v. Mullen*, 171 Wn.2d 881, 896, 259 P.3d 158 (2011).

In April 2002, the Richland Police Department asked Kennewick Police Detective Simon Mantel to collect and analyze two computers from Mr. Hilton's home (computers A and B) and two from the Ulrichs' home (computers C and D). Detective Mantel produced a 6-page report of his computer analysis on September 19, 2002. In a discussion pertaining to computer C, which was in the Ulrichs' downstairs family room, Detective Mantel stated on page 5 of his report: "Prior to the power outage,[2] user initiated activity ended at 8:07:33 PM on 3/20/02." Br. in Support of PRP, Appendix C at 5. Mr. Hilton contends that evidence that user initiated activity on the Ulrichs' downstairs computer continued until 8:07 p.m. is critical exculpatory evidence given corroboration by his teammates that he arrived for volleyball at 8:30 p.m. There is no

---

[2] A power outage occurred at several neighboring homes, including the Ulrichs', at approximately 1:00 a.m. on March 21, 2002. The utility company restored the power after 2:00 a.m. No cause for the outage was ever determined.

dispute that the State provided the defense a copy of the Mantel report before Mr. Hilton's first trial.

In 2003, Detective Mantel was called to active military duty and did not return to the Kennewick Police Department. The State listed him as a witness for the first trial. He was not called to testify.

In December 2002, Prosecutor Andy Miller asked Kennewick Police Detective T.D. Scott to provide Detective Mantel's work from computer C to Sergeant Wehner of the Richland Police Department and J.D. Fluckiger of Battelle, a private company that manages a national laboratory for the U.S. Department of Energy in Richland. According to Detective Scott's report dated December 24, 2002, Mr. Fluckiger requested the EnCase Evidence file copy of computer C as designated in Detective Mantel's report. As with Detective Mantel's report, the defense received Detective Scott's report in discovery.

On February 4, 2003, Mr. Miller wrote in a letter to defense counsel that the State may or may not be able to obtain Detective Mantel's presence at trial, but that his office was working with Battelle to see if its personnel might be able to review the hard drives and provide the testimony that would have been provided by the detective. Mr. Miller's letter noted that defense counsel had received earlier notice of this contingency in discovery. On February 28, 2003, Mr. Miller wrote in another letter to defense counsel explaining logistical limitations on dates that Detective Mantel could testify and requesting a stipulation that the State could call him out of order during the defense case.

13

There was no further mention of Mr. Fluckiger. Neither party called Detective Mantel or Mr. Fluckiger as a witness at either trial, nor did either party seek to introduce evidence of usage or activity on the Ulrichs' computers.

In support of the present petition, Mr. Hilton has filed a declaration from Mr. Fluckiger dated June 27, 2013, in which he states that he met with defense investigator Winthrop Taylor, who showed him Detective Scott's December 24, 2002 police report referring to Mr. Fluckiger as having been asked to review Detective Mantel's work on the computers. Mr. Fluckiger states in the declaration that Battelle's legal department gave him permission to assist Mr. Miller in determining the nature and quality of Detective Mantel's work on the condition Mr. Fluckiger would not testify as an expert witness. He met with Mr. Miller and a Kennewick police representative. He states that Mr. Miller gave him a report that referred to EnCase forensic software and a single CD and asked him to explain what the report said in terms Mr. Miller could understand. Mr. Fluckiger reviewed the disk and felt comfortable that the information Detective Mantel had provided was "fairly sound," but he never went into the EnCase files to determine what was there. Br. in Support of PRP, Appendix E, Fluckiger Declaration at 2. Instead, he just looked at Detective Mantel's presentation and explained it to Mr. Miller. He recalls looking to see if the times between one computer and another computer correlated with one another and concluded that they did, but he did not go back and do a personal evaluation of the original files.

14

Mr. Hilton alleges a *Brady* violation based upon the fact that the State never informed the defense that Mr. Fluckiger had confirmed, in terms that Mr. Miller could understand, the soundness of Detective Mantel's report. Mr. Hilton's characterization is that the State "possessed Detective Mantel's report, and knew his conclusions had been confirmed by a second expert at Battelle: someone was using the Ulrichs' computer until 8:07 p.m. on the night they died—the same time Mr. Hilton was on his own computer at his own home." Pet'r's Reply Br. at 31. Mr. Hilton contends that had the State disclosed the Fluckiger confirmation, defense counsel would have taken another look at Detective Mantel's report, and specifically checked his work on computer C.

*Detective Mantel's conclusions were not suppressed*

While forced to admit that the defense received the Mantel report, the Scott report, and Mr. Miller's letters, Mr. Hilton likens his case to *Stenson*, 174 Wn.2d 474, in which evidence was accessible to the defense but not in any meaningful manner. The evidence of Stenson's guilt for two murders was largely circumstantial, but two key pieces of evidence admitted at trial directly tied him to the shootings: (1) gunshot residue (GSR) found inside the front right pocket of jeans that Stenson was wearing when officers arrived at his house, and (2) blood spatter on the front of those jeans that was consistent with one of the victim's blood protein profile. *Id.* at 478. Fifteen years after his conviction, postconviction counsel received (1) photographs taken before the testing of the pockets for GSR, showing a sheriff's detective wearing Stenson's jeans with the right

15

pocket turned out and showing the detective's ungloved hands, and (2) an FBI file containing the GSR test results that revealed a person named Lundy, and not the State's expert Peele, as Peele's trial testimony had implied, had performed the GSR tests at the FBI laboratory. *Id.* at 479-80.

A defense investigator had been provided with pretrial access to the photographs during a meeting with Rod Englert, a State's expert. Mr. Englert—who had been provided with the defendant's pants on April 14, 1994—had turned the pockets out on that date to look for blood evidence. *Id.* at 480. Mr. Englert also recommended at that time that the pockets be tested for GSR, which they were, six days later—*after* having been handled by the ungloved law enforcement officer. The State argued that it had not suppressed the photograph because it had been available to the defense investigator from Mr. Englert's file. But a trial court later found in a reference hearing that nothing in materials provided to the defense team stated that the Englert examination had included turning the pockets out or anyone being ungloved. *Id.* at 482. The appellate court agreed with the trial court that the fact that the detective put his ungloved hand in the pocket before the GSR testing "'should have been disclosed.'" *Id.* at 490.

Mr. Hilton contends that as with expert Englert in *Stenson*, the fact that the State did not intend to call Detective Mantel made it reasonable for the defense to conclude that he had nothing relevant to the case and no further inquiry was needed. Mr. Hilton further asserts it was reasonable for the defense to rely on the State's constitutional

requirement not to violate due process by presenting a theory when it possessed evidence

that disproved the theory. Mr. Hilton asserts that it was the Fluckiger confirmation that

would have pointed defense counsel to the truth about the use of computer C by a person

at 8:07 p.m., thereby rendering it material for *Brady* purposes and its withholding

prejudicial.

We reject Mr. Hilton's arguments. First, it is undisputed that the State disclosed

Detective Mantel's report to the defense before the first trial. Unlike the photographs in

*Stenson*, whose significance arose from their timing—something not apparent from the

photographs—the significance that Mr. Hilton attaches to Detective Mantel's report is

manifest in the detective's statement in the report that "user initiated activity [on

computer C] ended at 8:07:33 PM on 3/20/02." Br. in Support of PRP, Appendix C at 5.

Mr. Hilton points out that the information was among 2,000 pages of discovery, the

information about the activity on computer C was in a single sentence on page 5 of the

report, and the State's witness summary for Detective Mantel stated only that he had

examined Kevin Hilton's computer. But the State has no obligation under *Brady* to point

the defense to specific documents within a larger mass of material that it has already

turned over. *Mullen*, 171 Wn.2d at 896. Moreover, as the *Mullen* court explained:

> [W]here "a defendant has enough information to be able to ascertain the
> supposed *Brady* material on his own, there is no suppression by the
> government." [*United States v. Aichele*, 941 F.2d 761, 764 (9th Cir.
> 1991)]. "'[W]here the defendant is aware of the essential facts enabling
> him to take advantage of any exculpatory evidence, the Government does

17

not commit a *Brady* violation by not bringing the evidence to the attention of the defense.'" *Raley v. Ylst*, 470 F.3d 792, 804 (9th Cir. 2006) (quoting *United States v. Brown*, 582 F.2d 197, 200 (2d Cir.1978)).

*Mullen*, 171 Wn.2d at 896 (footnote omitted).

Besides having the Mantel report, the defense had Detective Scott's report revealing the prosecutor's interest in computer C. The Scott report stated that Battelle's Mr. Fluckiger had been asked to review the Mantel report with respect to the "work Det. Mantel had done on 'Computer C'" and that Mr. Fluckiger needed and was provided with "the Encase[ ] files for Computer C." PRP of Hilton, Holt Declaration, Exhibit 3 at 1. The prosecutor's subsequent letter to the defense stated that his office was working with Battelle to see if its personnel might be able to review the hard drives and testify to what Detective Mantel would have testified to. The defense had the essential facts to which it now attaches significance.

We also observe, as relevant to this ground for relief and the next, that it is a mischaracterization of the Mantel report to say that it states or opines that someone was physically using the Ulrichs' downstairs computer at 8:07 p.m. on March 20. It does not. Mr. Hilton supports his petition with an unsigned "declaration" from Detective Mantel, which was prepared based upon an interview of Detective Mantel by defense investigator Winthrop Taylor in 2012. Mr. Taylor states that the unsigned declaration is an accurate account of matters Detective Mantel would testify to if called. Detective Mantel's unsigned declaration explains the meaning of the "user initiated activity" he was looking

18

for in 2002 as "the last activity on the computer that was not associated with any automated recurring computer initiated programs." Pet'r's Br. in Support of PRP, Appendix D, at 3. He states that making that determination is a subjective expert opinion that depends on an examiner's expertise and training in computer forensics. He prepared his 2002 report in anticipation that he would either be deposed by a defense expert or called to testify in court and his report sat on top of other files that would have allowed him, at the time, easy access to the underlying data from which he drew his conclusions. Although he was provided by Mr. Taylor in 2012 with a CD that appeared to contain his report, he was unable to rebuild the supporting documents from the disk. While he recalls it was important to make sure there was not some isolated recurring computer generated program or non-user activity before he reached his conclusion that the activity on computer C was user initiated, no underlying data is presented or explained.

The report's subjective opinion that user initiated activity ended at 8:07 p.m. therefore does not shed light on when the user initiated activity began, the time of the last certain human contact with the computer, or whether the computer merely timed-out at 8:07 p.m. after a period of human inactivity.

Unlike in *Stenson* where material exculpatory evidence was suppressed by the State, the Mantel report was never suppressed. In addition to full disclosure of the core evidence—the report—the State notified the defense that it was exploring whether Battelle would be able to provide an expert to testify to the matters otherwise expected

19

from Detective Mantel, disclosed a report revealing that it had an interest in Detective Mantel's work on computer C, and provided a report identifying Mr. Fluckiger by name.

*The Fluckiger assessment and explanation was not material*

Mr. Hilton is correct that the State never informed the defense of what Mr. Fluckiger ultimately told Mr. Miller in 2003. But Mr. Hilton cannot demonstrate that the Fluckiger assessment was material.

Mr. Fluckiger could add nothing, because he did not examine the actual files in the computer and did not look at the hard drive. He did no analysis of his own and never issued a report. He only looked at Detective Mantel's presentation and confirmed that he felt comfortable that the information Detective Mantel had provided was fairly sound.[3] The State merely failed to disclose that, having been told by Battelle that he could not testify as an expert, Mr. Fluckiger spoke with Mr. Miller, told Mr. Miller what he understood the detective's report to say, and expressed his view that the report appeared

---

[3] Although not dispositive of the petition, we reject as unsupported the State's alternative theory that Detective Mantel's report is not material for *Brady* purposes because he may have failed to account for the April 7, 2002 change to daylight savings time when he did his report in September 2002. The State posits that if Detective Mantel made this mistake in failing to realize the computer clock had set itself ahead one hour, the true time that user initiated activity ended would have been 7:07 p.m. on March 20, thus fitting well within the 6:42 p.m. to 7:41 p.m. timeframe for Mr. Hilton to have committed the murders. But Detective Mantel's report indicates he examined the computer on April 2, 2002—prior to daylight savings time taking effect on April 7. Detective Mantel's report also indicates he confirmed the computer time with satellite time. Pet'r's Br. in Support of PRP, App. C at 3.

20

competently prepared. This inconsequential assessment of information available to the defense could not reasonably put the prosecution of Mr. Hilton in such a different light as to undermine confidence in the verdict.

In a statement of additional authorities, Mr. Hilton calls our attention to *Lapointe v. Commissioner of Correction*, 316 Conn. 225, 112 A.3d 1 (2015), a rape/murder/arson conviction where the petitioner received a new trial in state habeas proceedings due to the prosecution's *Brady* violation for withholding the lead detective (Ludlow's) note referencing the expert opinion of state fire investigators about the particular timeframe in which the fire could have started. The Ludlow note was not disclosed to defense counsel before trial. Lacking the exculpatory information, counsel did not call a witness (Martin) who would have testified that the defendant was home watching television with her during the entire relevant timeframe. The defendant was thus deprived of evidence "establishing a complete and potentially compelling alibi [defense], thereby gravely undermining the [validity] of the verdict" and entitling him to a new trial. *Id.* at 349.

*Lapointe* is also not helpful to Mr. Hilton. Unlike in that case, where expert opinion was present but suppressed under *Brady*, the Mantel report was not withheld from Mr. Hilton. And unlike in *Lapointe*, Mr. Hilton demonstrates no complete and potentially compelling alibi claim that he failed to present as a result of a State nondisclosure.

21

Mr. Hilton fails his burden under *Cook* of showing constitutional error in the form of a due process violation under *Brady*.

*Ground 2: Denial of Due Process by the State's Knowing
Presentation of and Reliance on False and Misleading Evidence to
the Court and Jury*

Mr. Hilton next contends that the State presented known false and misleading evidence and thus violated his right to due process in two ways: (1) failing to inform the jury of the critical 8:07 p.m. usage of Ulrichs' downstairs computer when presenting its timeline for the murders, and (2) falsely informing the trial court (and this court in the direct appeal) that a 2008 DNA[4] test excluded Lisa Ulrich as the source of DNA on the shell casings.

It is fundamental that the Fourteenth Amendment to the United States Constitution cannot tolerate a state criminal conviction obtained by knowing use of false evidence or improper manipulation of material evidence. *United States v. Bagley*, 473 U.S. 677, 105 S. Ct. 3375, 87 L. Ed. 2d 481 (1985); *Giglio v. United States*, 405 U.S. 150, 92 S. Ct. 763, 31 L. Ed. 2d 104 (1972); *Miller v. Pate*, 386 U.S. 1, 87 S. Ct. 785, 17 L. Ed. 2d 690 (1967); *Napue v. Illinois*, 360 U.S. 264, 79 S. Ct. 1173, 3 L. Ed. 2d 1217 (1959); *Alcorta v. Texas*, 355 U.S. 28, 78 S. Ct. 103, 2 L. Ed. 2d 9 (1957); *see also Troedel v. Wainwright*, 667 F. Supp. 1456, 1458 (S.D. Fla. 1986) (term "false evidence" includes

---

[4] Deoxyribonucleic acid.

the "introduction of specific misleading evidence important to the prosecution's case in chief [or] the nondisclosure of specific evidence valuable to the accused's defense.") (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 647, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974)). A new trial is required if the false evidence could in any reasonable likelihood have affected the verdict. *Giglio*, 405 U.S. at 153; *Napue*, 360 U.S. at 271; *see Brown v. Borg*, 951 F.2d 1011, 1015 (9th Cir. 1991).

### *Ulrich Computer Usage and a Murder Timeline*

Mr. Hilton contends the State violated his right to due process by presenting a knowingly inaccurate theory that he killed the Ulrichs before 7:41 p.m., even though the State was aware from Detective Mantel's report and the confirmation from Mr. Fluckiger that user initiated activity on the Ulrichs' downstairs computer continued until 8:07 p.m. Mr. Hilton asserts that due process was violated by the State's failure to disclose the Fluckiger confirmation to the defense and its presentation of the false impression that the Ulrichs were dead before 7:41 p.m. He insists that the fact someone else was using the Ulrichs' computer while he was at his home on his own computer, and after the State theorized the Ulrichs were dead, puts the case in an entirely different light.

In addition to arguing the Ulrich computer evidence is not material but only speculative, the State argues that it did not assert that the killings occurred before 7:41 p.m.; rather, it left the timeframe open, relying on Mr. Hilton's discredited explanations for his whereabouts for most of the evening and night of the murders.

The record bears out the State's position. In opening statement, the prosecutor did not suggest a particular timeframe for the murders. He said the evidence would show Mr. Hilton had plenty of time to murder the Ulrichs after Lisa Ulrich and her children left during dinner time and before he arrived at his volleyball game.

In closing argument, the State argued in general terms that Mr. Hilton had plenty of opportunity to commit the murders given the timeframe in which the Ulrichs died according to the pathology experts. It argued broadly that "[d]uring the period of time when Larry and Jo Ulrich were most likely murdered, the defendant cannot account for his whereabouts. And then the defendant can't account for his whereabouts after 10:45 p.m." RP (Feb. 13, 2008) at 3816-17. The prosecutor also suggested that Mr. Hilton might have been at the Ulrich home both before *and* after volleyball on the night of the murders, asking, "Did the defendant go back? Very, very possible." *Id.* at 3817. The prosecutor emphasized Mr. Hilton's failed grocery store and library alibis, his inability to prove his whereabouts after the 6:42 p.m. telephone call to the Ulrichs, and his explanation to volleyball teammates (but not to police) of his unusual lateness due to a garbage spill in his kitchen. In rebuttal closing, the prosecutor told the jury that the Ulrichs were murdered on the night of March 20, and "[y]ou can set any time you want from maybe 6:00 to 10:00, according to Doctor Selove and Doctor Reay, but that's when they were murdered." *Id.* at 3896.

24

It was only defense counsel who proposed timeframes to the jury in order to shoot them down. During opening statement, defense counsel contended that the State would be stuck arguing that the murder occurred roughly between 7:40 p.m. and 8:30 p.m., with Mr. Hilton getting off the Internet, scrambling over to the Ulrichs, shooting them, running around the house and grabbing things, dragging bodies around and then calmly showing up at volleyball at 8:30 p.m. In its closing argument, the defense focused on a different timeframe, arguing that the 59-minute period from Mr. Hilton's 6:42 p.m. telephone call to the Ulrichs until his computer logon at 7:41 p.m. was insufficient time for him to commit the murders, clean up, and get ready to go to volleyball. Defense counsel argued that Mr. Hilton was home on the Internet at 7:41 p.m. and again at 7:58 p.m. for over 10 minutes, and that a person who just committed murder would not be sitting casually on the Internet for 10 minutes before cleaning up spilled garbage and walking out the door to volleyball.

Thus only the defense, not the State, argued that the killings had to occur either before or after 7:41 p.m.

In his reply brief, Mr. Hilton is forced to concede that the State did not commit to a timeframe for the murder in the second trial. But he points out that the State did commit to a 6:42 p.m. to 7:41 p.m. timeframe in the first trial and suggests that "perhaps" the State "backed away from [the] time commitment" "because the prosecutor realized this time was impossible given the evidence it possessed." Pet'r's Reply Br. at 31. Mr.

25

Hilton persists in arguing that the State created false inferences it knows were not possible, even if no specific piece of evidence and no specific argument was false. Pet'r's Reply Br. at 27. Yet Mr. Hilton is unable to direct us to even that evidence or argument, general or specific, that he contends created false inferences.

Essentially, Mr. Hilton's position is that once the State invited the jury to consider the entire 6:00 p.m. to 10:00 p.m. timeframe, it was obliged to affirmatively present the jury with Detective Mantel's conclusion about user initiated activity and concede that for some time between 7:58:35 p.m. and 8:07:33 p.m., some human being other than Kevin Hilton was using the downstairs computer at the Ulrich home at the same time that Kevin Hilton was at his own home, using the Internet, thereby making it impossible for Mr. Hilton to have committed the murder before his 8:30 p.m. arrival at volleyball.

The State's response offers several reasons why the evidence does not require any such concession.

It points out first, as we previously touched upon, that Detective Mantel's conclusion that user initiated activity on the Ulrichs' downstairs computer ended at 8:07:33 p.m. does not mean that someone was physically at the computer until that time. Resp. to Pers. Restraint Pet. at 19 (Resp.) ("[User initiated activity] does not provide a definite time at which a person stepped away from the computer. . . . Detective Mantel's report does not conclude that an individual was definitely on the Ulrich computer at 8:07:33 p.m.").

26

It points out that Mr. Hilton might have been the person using the Ulrichs' computer after 8:00 p.m. Resp. at 21 ("After murdering the Ulrich[s], the evidence shows that the defendant took incriminating evidence from their residence. . . . He may have checked the Ulrich computer to see if he could find any obvious evidence pointing to him."). While Mr. Short, the defense computer expert, testified that a computer at Mr. Hilton's home was engaged in Internet use from 7:58:35 p.m. to 8:10:24 p.m., the State points out that Mr. Short agreed that the use could have been automated; Mr. Hilton didn't need to be there.[5] Resp. at 17 ("[The 7:58:35 log onto the Internet] was less likely to be human involved, according to the defendant's computer expert"); *id.* at 22 ("[N]o

_____

[5] As Mr. Hilton points out, the prosecutor stated at one point during his closing argument that, "We know [Mr. Hilton's] home at 7:41. We know that at 7:58 to 8:09 he's on the [I]nternet." RP (Feb. 13, 2008) at 3816. Mr. Hilton argues in his reply brief that the prosecutor's statement in closing argument was a concession by the State and that the doctrine of judicial estoppel now bars the State from making a directly contradictory factual assertion. It cites no case holding that the State cannot recognize the reality on appeal that evidence presented to the jury supported findings different from those that it advanced in closing.

Mr. Short's testimony unquestionably allowed for the possibility that the Internet use on Mr. Hilton's computer between 7:58:35 p.m. and 8:10:24 p.m. was automated. RP (Feb. 7, 2008) at 3261, 3268. Jurors who were paying attention to Mr. Short's testimony could have analyzed the evidence with that fact in mind notwithstanding the prosecutor's single concession during lengthy closing arguments that Mr. Hilton was on the Internet at 7:58 p.m. (the closing arguments took most of an afternoon and account for almost 100 pages of the report of proceedings). The jurors were instructed, "It is important . . . for you to remember that the lawyers' statements are not evidence." RP (Feb. 13, 2008) at 3791.

one, including the defendant's computer expert, can state that the defendant was home between 7:41 and 8:30 p.m.").

It points out that given the short distances involved and the likelihood that traffic was light, it would have been possible for Mr. Hilton to leave his home at 8:10 p.m., commit the murders, and still arrive at volleyball around 8:30 p.m. Resp. at 20-21 (Mr. Hilton "had sufficient time to fire five shots at the Ulrich[s], make a quick search for incriminate[ing] evidence, [missing some, . . . and] would have been able to appear within minutes at the volleyball game").

Mr. Hilton relies heavily on four cases: *Miller v. Pate*, 386 U.S. 1; *Alcorta v. Texas*, 355 U.S. 28; *Brown v. Borg*, 951 F.2d 1011; and this court's opinion in *State v. Martinez*, 121 Wn. App. 21, 86 P.3d 1210 (2004). But in all of those cases, the defendants could point to false testimony known to the State, or false argument by the State.

In *Miller*, the prosecutor made repeated references to the murder defendant's "bloody shorts" that were allegedly stained with blood matching the victim's blood type. The shorts were a key part of the prosecution's case, yet they were not actually the defendant's shorts and the prosecutor knew at the time of trial that it was not blood on the shorts, rather paint. The Court held that the prosecutor's knowing use of false evidence violated the defendant's due process rights and warranted reversal of the conviction. *Miller*, 386 U.S. at 5-7.

28

In *Alcorta*, the defendant was charged with murdering his wife while she sat in a car kissing another man, Castilleja. Because Alcorta suspected the two were having an affair, he claimed the killing was murder without malice, but in a fit of passion. Castilleja testified for the State and denied any sexual relationship. Alcorta was convicted of murder and sentenced to death. Castilleja later provided a sworn statement admitting he had falsely testified at trial and that he had in fact had sexual relations with the defendant's wife. *Alcorta*, 355 U.S. at 30. In habeas proceedings, the prosecutor admitted knowing of the perjury, withholding the information from Alcorta, and taking no steps to have Castilleja testify truthfully. The Supreme Court held that the prosecutor's failure to correct known false testimony violated due process. *Id.* at 31-32.

In *Brown*, the defendant was convicted of first degree felony murder based upon the prosecution's theory that he was involved in killing the victim during a robbery. A detective testified to his opinion that the victim was killed during a robbery because a ring was found on the ground, but his gold chains and wallet were missing. In closing, the prosecutor argued there was no testimony that any property of value was found on the victim. *Brown*, 951 F.2d at 1013. In fact the prosecutor knew during trial, but did not inform the detective or defense counsel, that the victim's wallet and gold chains had been given to his relatives by hospital personnel, who presumably had discovered them on his person. *Id.* at 1014. The court found reversible misconduct because the prosecutor was "[p]ossessed of knowledge that destroyed her theory of the case," and "had a duty not to

29

mislead the jury. Instead, she kept the facts secret in the face of a long-standing rule of constitutional stature requiring disclosure, and then presented testimony in such a way as to suggest the opposite of what she alone knew to be true: that the wallet and chains had not been stolen in a robbery." *Id.* at 1015.

In *Martinez*, 121 Wn. App. 21, a State's witness identified two guns used in a robbery as weapons the defendant had shown her in December 1999. The State determined during pretrial investigation that the witness could not have correctly identified one of the guns because it belonged to a third party until October 2000, but rather than inform the defense, the prosecutor dissembled in opening statement, telling the jury that it was expected the witness would identify the guns in some fashion: "[S]he can't tell you that these are the same guns, I think she will say that they just looked the same." *Id.* at 26. The prosecutor later notified the defense it would not question the witness about the gun lineup and it was eventually revealed that the gun identified by the witness could not have been the same gun used in the robbery. *Id.* at 28.

In upholding the trial court's dismissal of the charges for governmental misconduct under CrR 8.3(b), this court ruled that substantial evidence supported the fact that the State waited so long to provide the exculpatory evidence to the defense as to be "repugnant to principles of fundamental fairness" and a violation of due process. *Martinez*, 121 Wn. App. at 35. The defendant was prejudiced in his right to counsel and

30

denied effective assistance because the late discovery compromised defense counsel's ability to adequately prepare for trial. *Id.* at 34-35.

Unlike the defendants in *Miller*, *Alcorta*, *Brown*, and *Martinez*, Mr. Hilton is unable to point to any false or misleading evidence or information that was relied on, secreted, or proffered by the State. All he can show is that the State refused to draw or argue the inferences that he would have drawn from the available evidence and chose not to offer Detective Mantel's testimony or the results of his computer review. While every "prosecutor is a quasi-judicial officer" of the court, *State v. Huson*, 73 Wn.2d 660, 663, 440 P.2d 192 (1968), charged with the duty of ensuring that an accused receives a fair trial, the State was not required to present both its own and the defense case.

Mr. Hilton makes no showing, as is his burden under *Cook*, that the State misled the jury with any false evidence or false inference.

### *DNA Report re Lisa Ulrich*

Mr. Hilton next contends the prosecutor falsely informed the court during the second trial that a 2008 DNA test excluded Lisa Ulrich as the source of DNA on the shell casings. During trial, Washington State Patrol Crime Laboratory scientist Charles Solomon testified that he tested the three shell casings from the murder scene and found no detectable DNA on any one shell casing, but was able to combine extracts from all three to obtain a very small sample. He concluded the DNA came from female sources, conclusively excluding Mr. Hilton. Mr. Solomon said laboratory tester Lisa Turpen

31

could possibly have left her DNA on the sample during testing and he could not exclude

her or other females with allele matches. He also found DNA consistent with Ms.

Turpin's profile on an extract from one bullet found at the crime scene. Mr. Hilton and

the victims were excluded as a match for the DNA on that bullet.

After Mr. Solomon's testimony, and before Ms. Turpen testified, the State

proposed to offer a January 28, 2008 DNA report completed by Ms. Turpen. When asked

by the court for an offer of proof of what was new in this recent report, the prosecutor

stated:

> Ms. Turpen did a DNA analysis of Jennifer Ulrich, Lisa Ulrich, and Carly
> Connell and compared their DNA profiles to the shell casings and the bullet
> Mr. Solomon testified about this morning, and that she concluded that none
> of those three individuals contributed DNA to the shell casings or the
> bullet.

RP (Feb. 1, 2008) at 2670-71. The court denied admission of the report because of its

late disclosure to the defense.

The prosecutor's offer of proof was mistaken. Ms. Turpen's report actually

stated with reference to Jennifer Ulrich, Lisa Ulrich, and Lisa's daughter, Carly Connell,

that no comparisons can be made to the trace DNA profile of limited genetic information

obtained from the combined extract of the shell casings and the extract of bullet 16. The

State concedes that the offer of proof was mistaken and overstated the conclusions of the

DNA report. It points out that it was not attempting to mislead the trial judge.

32

The offer of proof was made in connection with the State's request to offer evidence that was excluded, and Mr. Hilton does not assign error to the report's exclusion. His argument why the overstatement is reversible error is an attenuated one: he contends that it was "material to the conclusion that defense counsel presented insufficient evidence to allow its theory that Lisa Ulrich was the murderer." Br. in Support of PRP at 38.

The offer of proof was not made in connection with any argument about the sufficiency of evidence to support a third party perpetrator theory. In fact, it is the law of the case, based on this court's decision in the second appeal, that Mr. Hilton "never sought to blame [Lisa Ulrich] for the killings and does not get to change his theory on appeal." *Hilton*, 164 Wn. App. at 98.

While this court went on to hold in the second appeal that Mr. Hilton had not presented or offered sufficient evidence to blame Ms. Ulrich for the killings in any event, we would never weigh an offer of proof, followed by the exclusion of evidence, as if the offer of proof was itself evidence—nor did we. In discussing the insufficiency of Mr. Hilton's third party perpetrator evidence in the second appeal, no consideration was given to the possibility that DNA evidence that was never admitted might have cut against the theory. *Id.* at 100-01.

Mr. Hilton separately asks us to reconsider the sufficiency of his third party perpetrator evidence in connection with an ineffective assistance of counsel claim, which

we do below. As discussed hereafter, since the State's mistaken overstatement never factored into the decision on the second appeal, the disclosure that it was an overstatement does not require reconsideration.

Mr. Hilton fails in his burden under *Cook* on his due process claims in ground 2.

*Ground 3: Ineffective Assistance of Counsel*

Mr. Hilton next claims his trial lawyers were ineffective for failing to (1) adequately investigate and present the State's evidence of his alibi (the Mantel report), and (2) make an adequate offer of proof of their intent to present a third party suspect defense.

To establish ineffective assistance of counsel, Mr. Hilton must show that his attorney's performance was deficient and that he was prejudiced by the deficiency. *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984); *State v. McFarland*, 127 Wn.2d 322, 334-35, 899 P.2d 1251 (1995). A petitioner demonstrates deficient performance by showing that counsel's conduct fell below an objective standard of reasonableness. *Strickland*, 466 U.S. at 686; *Rice,* 118 Wn.2d at 888. "In this regard, the court must make every effort to eliminate the distorting effects of hindsight and must [ ] presume that counsel's conduct constituted sound trial strategy." *Rice*, 118 Wn.2d at 888-89 (citing *Strickland*, 466 U.S. at 689). Defense counsel's duties include making a reasonable investigation or making a reasonable decision that a particular investigation is unnecessary. *Rice*, 118 Wn.2d at 889. Defense counsel's decision not to investigate

must be assessed in light of all the circumstances. *Id.* To show deficient performance, the petitioner must show the absence of any conceivable legitimate trial tactic explaining counsel's performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011); *State v. Reichenbach*, 153 Wn.2d 126, 130, 101 P.3d 80 (2004). To demonstrate prejudice, a petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the [trial] would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

### A. Inadequate investigation of alibi evidence

Mr. Hilton supports his claim of inadequate investigation of alibi evidence with the declaration of his trial co-counsel, Kevin L. Holt, who states that he was the attorney primarily responsible in trial preparation for investigating and presenting the computer evidence. Mr. Holt acknowledges receiving the Mantel report in discovery. But he says he never understood from the report that Detective Mantel had determined a person was using the Ulrichs' computer at 8:07 p.m. on the night of the murders, and had he understood that fact, he would have called him to testify. Mr. Holt further states he was never informed that Mr. Fluckiger had confirmed Detective Mantel's conclusion that a person was using the Ulrichs' computer at 8:07 p.m. and, had he understood, he would have interviewed and called Mr. Fluckiger to testify. Mr. Holt states he had no strategic purpose in not presenting evidence to the jury that a person was using the Ulrichs'

35

computer at 8:07 p.m., when it was undisputed that Mr. Hilton was at home on his computer from 7:58 to 8:10 p.m. Mr. Holt states the evidence would have contradicted the prosecution's theory that Mr. Hilton killed the Ulrichs before he arrived home at 7:41 p.m., and would have meant either that they were still alive at 8:07 p.m., or the real killer was there using their computer. Mr. Holt states he would have argued that the evidence supported the theory that Lisa Ulrich was the killer because she had used her parents' computer earlier that day to purchase event tickets and knew how to use it.

Mr. Hilton's co-counsel, Peter Connick, makes similar statements, although Mr. Connick does not remember seeing Detective Mantel's 6-page report. He says he undoubtedly reviewed it if it was provided in discovery.

Mr. Hilton now contends his attorneys Holt and Connick performed deficiently by not following up on the Mantel report. He faults counsel for not sufficiently interviewing Detective Mantel to learn the meaning of his conclusion, and for not having their own expert examine the Ulrichs' computers. He concludes he was prejudiced by counsels' failures because had they presented Detective Mantel's conclusion that someone was using the Ulrichs' computer until 8:07 p.m., it would have refuted the State's theory and given the jury the persuasive missing piece to verify his alibi.

Mr. Hilton compares his lawyers' omissions to several cases where convictions were reversed because counsel did not follow up on known exculpatory evidence that refuted the prosecution theory of the case. First is *Baylor v. Estelle*, 94 F.3d 1321 (9th

Cir. 1996), *cert. denied, Duncan v. Baylor*, 520 U.S. 1151, 117 S. Ct. 1329, 137 L. Ed. 2d 489 (1997), where the defendant was convicted of sexual assault. A criminologist's pretrial report concluded that seminal fluid tests tended to eliminate the defendant as the donor because he was a "secretor" and the semen donor was not. Baylor's counsel knew of the reports, but never followed up with the criminalist or sought testing by another expert. Counsel was unable to subpoena the criminalist during the trial because he was on vacation. The jury therefore never learned about the report. *Id.* at 1323. In postconviction proceedings, the court found counsel ineffective for failure to adequately investigate the known potentially exculpatory evidence and reversed the convictions. *Id.* at 1323-24.

In *Lord v. Wood*, 184 F.3d 1083 (9th Cir. 1999), the defendant's conviction for the rape and murder of a girl was reversed for ineffective assistance because counsel failed to call, or personally interview, three boys who claimed to have seen the victim alive a day after petitioner was supposed to have killed her. Counsel conceded in habeas proceedings that the boys' statements dovetailed with the defense and would not have opened the door to any damaging evidence and presentation of their exculpatory testimony would have entailed no risk to the defense. *Id.* at 1093.

In *Sims v. Livesay*, 970 F.2d 1575 (6th Cir. 1992), the defendant was convicted of murdering his wife. The prosecution theory was that he shot her from a distance as she lay in bed. The defendant claimed he entered the room to find her sitting in bed holding

the gun and intending to shoot herself and that she did so as he grabbed for the gun. *Id.* at 1576-77. Before trial, defense counsel was in possession of an FBI report revealing there was gunpowder residue on a quilt on the bed. This evidence would have contradicted the prosecutor's theory that the defendant shot the victim from a distance. Counsel was aware that the prosecution would use the lack of powder marks on the victim to argue the victim was shot from a distance, but failed to investigate the FBI report and did not introduce the quilt into evidence. *Id.* at 1580. In reversing the conviction due to ineffective assistance of counsel, the court reasoned the FBI report disclosed facts suggesting the State's theory was easily refutable, and moreover, presented the defense with a theory of the case that fully squared with the defendant's version of the events. *Id.* at 1580-81.

In *Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003), the court found counsel's performance deficient for failure to present either of two witnesses who could conclusively verify the defendant's alibi that he was at Knott's Berry Farm at the time that the murder victim disappeared from another location. In presenting the alibi, the attorney relied instead on the testimony of witnesses who could only vaguely recall corroborating circumstances. The court held that "[w]hen defense counsel undertakes to establish an alibi, but does not present available evidence of the time or even the date of the alibi, or offer a strategic reason for failing to do so, his actions are unreasonable." *Id.* at 871-72.

38

Finally, in *Cannedy v. Adams*, 706 F.3d 1148 (9th Cir. 2013), the defendant was convicted of committing lewd and lascivious acts on his stepdaughter. He alleged his counsel was ineffective because he ignored evidence that the victim had recanted her allegations in an Internet posting to a friend. *Id.* at 1161. Cannedy's "trial was largely a 'he said, she said' case, with no physical evidence linking [Cannedy] to the alleged abuse." *Id.* He was the sole defense witness, and his only defense was that the victim had fabricated the allegations. *Id.* The Internet posting would have explained the victim's motive to implicate Cannedy falsely. *Id.* The court held that under these circumstances, "[n]o competent lawyer would have declined to interview such a potentially favorable witness when that witness had been clearly identified, the witness was easily accessible and willing to provide information, and trial counsel faced a dearth of defense witnesses." *Id.*

None of these cases are helpful to Mr. Hilton because all involved counsel's failure to investigate evidence that was exculpatory on its face—in *Baylor* the defendant was a "secretor" and the semen donor was not; in *Lord* the three boys said they saw the victim alive a day after petitioner supposedly killed her; in *Sims* there was gunpowder residue on the quilt; in *Alcala* the witnesses verified the defendant's alibi that he was at Knott's Berry Farm when the murder victim disappeared from elsewhere; and in *Cannedy* the victim recanted her allegations in an Internet posting to a friend.

39

In contrast, Detective Mantel's subjective opinion about "user initiated activity" does not establish when hands-on use ended, and for that and the other reasons identified by the State (that Mr. Hilton could have been the last user of the Ulrichs' computer and that he had time to commit the murders after 8:10 p.m.) the Mantel report does not clinch his defense.

In a second statement of additional authority, Mr. Hilton calls our attention to *Crace v. Herzog,* 798 F.3d 840 (9th Cir. 2015). There, a panel of the Ninth Circuit affirmed the district court's granting of habeas relief to the petitioner Hoyt Crace on grounds he received ineffective assistance under *Strickland* because his trial counsel failed to request a jury instruction on misdemeanor unlawful display of a weapon as a lesser included offense of second degree assault. The jury convicted Crace of the lesser degree offense of attempted second degree assault—his third strike resulting in a life sentence without possibility of parole. But the evidence entitled Crace to the unlawful display of a weapon instruction had he requested it, and conviction for that offense instead of the felony would have avoided a third strike.

In determining that counsel's performance was deficient under *Strickland,* the court reasoned:

> Crace's attorney's failure to request the instruction was neither strategic nor deliberate. In a declaration . . . he explicitly stated that the "only reason [he] did not offer a lesser included instruction for unlawful display of a weapon was because [he] did not consider it." . . . [T]he declaration is properly before us and the state has made no attempt to dispute its

40

assertions. We therefore conclude that Crace's counsel made no strategic decision to forgo a lesser included offense instruction that commands our deference, and we hold that his outright failure even to *consider* the possibility of requesting a lesser included offense constituted deficient performance.

*Crace*, at 852 (2nd, 3rd and 6th alterations in original).

The court concluded that Crace was prejudiced by counsel's shortcoming because the evidence would have allowed the jury to rationally choose to convict Crace *only* of unlawful display of a weapon and it was reasonably probable the jury would have done so. *Crace*, at 850-51. This probability, the court concluded, is "'sufficient to undermine [our] confidence in the outcome'" so as to satisfy the prejudice prong of *Strickland*. *Id.* at 851 (alteration in original) (quoting *Strickland*, 466 U.S. at 694).

Here, as in *Crace*, we take at face value the unrefuted declarations of Mr. Hilton's attorneys that they, in essence, simply overlooked Detective Mantel's supposed conclusion that someone was using the Ulrichs' computer until 8:07 p.m. But unlike in *Crace* where the admitted evidence readily warranted the critical lesser included instruction, any deficient performance by Mr. Hilton's lawyers did not give rise to prejudice when the premise that a person was physically present at the Ulrichs' keyboard is purely speculative and thus cannot support Mr. Hilton's alibi and theory that Lisa Ulrich was the killer. *Crace* is therefore not helpful to Mr. Hilton.

41

Mr. Hilton is unable to show the essential element of prejudice from his lawyers' failure to investigate the Mantel report, call Detective Mantel or Mr. Fluckiger as a witness, or have his own expert examine the Ulrichs' computer.

Mr. Hilton fails his burden under *Cook* on this claim.

### B. Inadequate offer of proof re third party suspect defense

Finally, Messrs. Holt and Connick state in declarations filed in support of the petition that, contrary to our inference from the record in the second appeal that they never sought to blame Lisa Ulrich for the murders, they *fully* intended to present that third party perpetrator theory, and that their failure to articulate that intent was their error. They state it was not for any tactical or strategic purpose. They state they also intended to make an adequate record to preserve the issue for appeal. They believed the court's exclusion of this evidence and argument was the trial court's most serious error, completely frustrating their ability to defend Mr. Hilton.

Relying on *Griffin v. Harrington*, 727 F.3d 940 (9th Cir. 2013), Mr. Hilton now claims that counsels' failure to make a clearer record of their intent to present the third party perpetrator theory was deficient performance that prejudiced him because it denied him the right to present the meritorious defense at trial and defeated appellate review of the issue.

In *Griffin*, a prison inmate (Wilberger) alone implicated the defendant for murder in a recorded statement to police. But defense counsel (Aval) knew Wilberger

would testify differently from his statement and that the State would then offer his

previously recorded statement as substantive evidence. When Wilberger was called to

testify, he refused to take the oath. *Griffin*, 727 F.3d at 942. With no objection from

defense counsel, the trial court nonetheless proceeded with questioning of Wilberger by

the State and cross-examination by defense counsel. Wilberger denied implicating the

defendant. *Id.* at 943. When the State sought to admit his recorded statement the next

day, defense counsel objected on the grounds Wilberger had not testified under oath. The

trial court ruled counsel had waived the objection by not making it when the witness was

on the stand. The jury convicted Griffin. *Id.* The conviction was upheld on appeal, and

in a state habeas proceeding where the court concluded counsel had a credible tactical

reason for failing to object to the testimony. *Id.* at 944.

On federal habeas, the district court granted Griffin's writ and the Ninth Circuit

affirmed on appeal. The court explained:

> We have no doubt from the record and from Aval's declaration that he
> knew during Wilberger's testimony that his statements in court—in Aval's
> words—"were made without any oath [and] could not technically be
> considered evidence." What Aval did *not* know and what he did *not*
> comprehend under settled state law, however, was that by failing timely to
> object to that testimony in combination with conducting cross-examination,
> he was waiving *any* objection he might have had to Wilberger's testimony.
> The dire consequences of his ignorance on this point was first, that
> Wilberger's prior inconsistent inculpatory statement then became
> admissible against his client; and second, that his client would be barred on
> appeal from raising any issue related to Wilberger's sworn testimony. We
> repeat the California Court of Appeal's holding on direct appeal: "Because
> defense counsel did not object to Wilberger's testimony but instead went on

to cross-examine him, any objection to Wilberger's testimony due to the oath taking issue was waived."

Thus, by waiting to object until after Wilberger had been excused as a witness, and until the next day, Aval unwittingly sealed his client's fate, both at the trial and on appeal. He subsequently admitted that his failure immediately to object was a mistake because he thereby failed "to preserve the question for Mr. Griffin's appeal."

*Griffin*, 727 F.3d at 945-946 (alterations in original).

Ultimately, the court held that Griffin was prejudiced by counsel's shortcomings in unwittingly waiving his client's confrontation rights when Wilberger's disclaimed prior inconsistent statement constituted the only evidence in the prosecution's case that Griffin was the shooter. *Id.* at 948. And on top of other "glaring deficiencies in the prosecution's case, no physical evidence linked Griffin to the crime." *Id.* at 949. The court expressed doubt that Griffin would have been charged with the murder in the first place without Wilberger's recorded statement. *Id.*

Mr. Hilton contends based on *Griffin* that his attorneys were likewise ineffective because they unwittingly waived his third party perpetrator defense. He claims prejudice because the defense was actually viable, particularly given counsel's alleged ineffective assistance for not following up on the Mantel report and the State's misrepresentation that the DNA report excluded Lisa Ulrich.

The State, on the other hand, contends counsel made the correct tactical decision not to pursue a third party perpetrator argument for a reason we surmised in the second

44

appeal: "because the case against [Lisa Ulrich] was so weak that it would have made the defense look desperate," *Hilton*, 164 Wn. App. at 102, and because there was no legal ground for doing so anyway because Mr. Hilton could not meet his burden in the trial court to show the evidence created a train of facts or circumstances that clearly pointed to Ms. Ulrich as the perpetrator.

Insofar as the State's argument reflects our holdings in the direct appeal, we agree with its contentions. But for purposes of this petition, whether Mr. Hilton (like the defendant in *Griffin*) was prejudiced by any performance or omissions of counsel with respect to the "Lisa Ulrich third party perpetrator" defense abides our resolution of Mr. Hilton's ground 4, with the ultimate question being whether he presents additional and sufficient third party perpetrator evidence for consideration by a jury. As we discuss below, Mr. Hilton's arguments fail.

*Ground 4: Denial of Constitutional Right to Present a Defense*

Mr. Hilton claims he was denied his constitutional right to present a defense when the court prohibited him from presenting evidence that Lisa Ulrich was the real killer.

As a starting point, in PRPs, this court ordinarily will not review issues previously raised and resolved on direct review unless the petitioner shows the ends of justice would be served by reexamining the issue. *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388, 972 P.2d 1250 (1999); *see In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671, 101 P.3d 1 (2004). "This burden can be met by showing an intervening change in the law or some

45

other justification for having failed to raise a crucial point or argument in the prior application." *Gentry*, 137 Wn.2d at 388 (internal quotation marks omitted) (quoting *In re Pers. Restraint of Taylor*, 105 Wn.2d 683, 717 P.2d 755 (1986), *abrogated on other grounds by In re Pers. Restraint of Gentry*, 179 Wn.2d 614, 316 P.3d 1020 (2014)). As explained in *Gentry*:

> We take seriously the view that a collateral attack by PRP on a criminal conviction and sentence should not simply be reiteration of issues finally resolved at trial and direct review, but rather should raise new points of fact and law that were not or could not have been raised in the principle action, to the prejudice of the defendant.

*Id.* at 388-89.

Thus, in determining to what extent this court will revisit Mr. Hilton's third party perpetrator issue, the initial focus is on whether he presents new relevant facts or points of law not already inherent in the appeal opinion that are material to that defense. This court applied well settled federal and state law in rejecting Mr. Hilton's third party perpetrator issue on appeal. *See Hilton*, 164 Wn. App. at 99-103. We thoroughly discussed why the facts did not support that defense even if Mr. Hilton had wanted to raise it. *Id.* at 101-02. Mr. Hilton's purported new facts will be viewed through the same legal principles as in the appeal, but also with heightened focus in light of the State Supreme Court's intervening ruling in *State v. Franklin*, 180 Wn.2d 371, 325 P.3d 159 (2014).

In *Franklin*, the court reiterated longstanding Washington law stemming from the holding in *State v. Downs*, 168 Wash. 664, 13 P.2d 1 (1932), that other suspect evidence is admissible only if the defendant can show "a train of facts or circumstances as tend clearly to point out some one besides the [accused] as the guilty party." *State v. Franklin*, 180 Wn.2d at 379 (alteration in original) (quoting *Downs*, 168 Wash. at 667). The court stated that the *Downs* test remains essentially unchanged: "some combination of facts or circumstances must point to a nonspeculative link between the other suspect and the charged crime." *Franklin*, 180 Wn.2d at 381. The *Franklin* court reiterated that the *Downs* standard for relevance of other suspect evidence is whether there is evidence "'tending to connect' someone other than the defendant with the crime." *Id.* (citation omitted) (quoting *Downs*, 168 Wash. at 667). However, apparently for the first time in Washington case law, the *Franklin* court also explained with respect to the *Downs* relevance inquiry:

> Further, other jurisdictions have pointed out that this inquiry, properly conducted, "focuse[s] upon whether the evidence offered tends to create a reasonable doubt as to the *defendant's* guilt, not whether it establishes the guilt of the *third party* beyond a reasonable doubt." *Smithart v. State*, 988 P.2d 583, 588 & n.21 (Alaska 1999).

*Franklin*, 180 Wn.2d at 381 (alterations in original).

Mr. Hilton asks us to reconsider the third party perpetrator issue in view of what he considers additional evidence now known that undermines the State's argument regarding supposed "lack" of evidence to implicate Lisa Ulrich: (1) the State's expert

concluded someone was using the Ulrichs' computer until 8:07 p.m. when Mr. Hilton was then at his home on his own computer, and (2) the State's DNA test did not even compare, much less exclude, Lisa Ulrich's DNA from that recovered from the shell casings found at the scene. Mr. Hilton argues we should revisit the issue in light of the prosecutor's withholding of evidence regarding use of the Ulrich computer that Mr. Hilton says establishes it is impossible for him to be the murderer, and further adds to the balance of circumstantial evidence that Lisa Ulrich is the likely perpetrator. Mr. Hilton also says that in the context of the apparent close relationship between prosecutor Miller and Lisa Ulrich that earlier gave rise to a defense motion to disqualify Mr. Miller and his office before the first trial, the withheld evidence exposes his behavior to protect her from being investigated as a suspect and makes purported lack of evidence against her unreliable as a result of a tainted investigation.

As discussed, the Mantel report (which the defense had all along) and the Fluckiger opinion do not provide evidence that anyone was in fact physically present at the Ulrichs' computer at 8:07 p.m.—only speculation that cannot tend to place Lisa Ulrich (or anyone else) there at that time; and, and most critically, cannot tend to create reasonable doubt as to Mr. Hilton's guilt when he cannot show that anyone was actually present at the keyboard. As for the DNA report, the State's overstatement of its offer of proof was not evidence and was not considered in finding Mr. Hilton's third party perpetrator evidence insufficient earlier, so there is no reason to "reconsider" the issue on

48

that basis at all. These items add nothing to the quantum of evidence already discussed in the appeal. Nor does the *Franklin* case give cause to revisit our appeal decision.

Mr. Hilton further contends there are additional reasons for us to revisit the issue. He first refers to an anonymous non-traceable telephone call from a citizen to the police on March 29, 2002, in which the caller stated that Lisa Ulrich's parents disliked her new boyfriend, intended to cut off financial support to her, and to pursue custody of her children because they disapproved of how she was raising them. He also refers to a police report documenting another anonymous telephone call from a citizen on April 3, 2002, in which the caller said he saw Lisa Ulrich and her boyfriend (Joe Yahne) at Fred Rumsey's house on March 24, 2002, and that either Lisa or Joe was carrying a black object that they did not have when they left. The caller did not know what the object was. The police contacted Mr. Rumsey. He had no idea what someone might have seen, but said he did not recall them bringing anything to his house except personal items. Pet'r's Br. in Support of PRP, Appendix H.[6] Mr. Hilton now asserts that if counsel could question Ms. Ulrich on these matters, the jury would be permitted to assess from her answers whether she had a motive to kill her parents and whether she had access to someone (e.g. Mr. Yahne or Mr. Rumsey) who would have been able to help her commit

---

[6] Attorney Holt states in his declaration that the defense knew about both telephone calls at the time of trial and wanted to present the evidence but could only establish relevance if they could argue Lisa Ulrich was the murderer.

49

the crimes. Mr. Hilton additionally states if allowed to present his theory, counsel would have argued Lisa Ulrich was familiar with her parents' computer because she had used it earlier on the day of the murder. And, according to Mr. Hilton, Lisa had no alibi up until 8:30 p.m. on March 20. Mr. Hilton contends he is entitled to a new trial to present the above evidence.

The anonymous telephone calls, the unknown black object that cannot be identified, and Lisa Ulrich's familiarity with her parents' computer are insufficient support for a third party perpetrator claim because they contribute nothing to a train of circumstances that tend to point to Lisa Ulrich as the guilty party, nor do they tend to create any reasonable doubt as to Mr. Hilton's guilt. Over a decade after the anonymous calls were made, and following defense investigation for two trials and this petition, there is still no substantiation for the hearsay innuendo against Ms. Ulrich conveyed in the anonymous 2002 calls. As the State points out, there could be no cross-examination regarding the anonymous telephone calls and unknown black object.

Given that Mr. Hilton still fails to present sufficient relevant evidence to allow him to present to a trier of fact the theory that Lisa Ulrich murdered her parents, none of the several cases on which he relies are helpful to him.

In *United States v. Stever*, 603 F.3d 747, 755 (9th Cir. 2010), the court held that the defendant was denied his constitutional right to present a defense when the trial court excluded relevant and reliable evidence probative to the central issue of whether he was

complicit with Hispanic individuals in a marijuana growing operation on his mother's remote land bordering Forest Service property in Oregon. The case against Stever was circumstantial. His proffered defense was that a Mexican drug trafficking organization (DTO) grew the marijuana and he had no knowledge of the operation. *Id.* at 756. His offer of proof included government reports describing Mexican DTO operations on public and private land and an expert witness who would testify that such operations in Oregon excluded local Caucasian landowners. *Id.* By excluding the evidence, the trial court prevented him from making his defense at all. *Id.* at 757. He was thus confined to poking holes in the government's case and, as his lawyer argued in closing, holding the prosecution to its burden of proof. The court concluded Stever's Sixth Amendment rights were violated. *Id.*

As in *Stever*, Mr. Hilton contends the trial court's ruling on third party perpetrator evidence precluded him from pointing to any alternative explanation for who committed the crime and confined him to poking holes in the State's case and holding the State to its burden of proof, thus literally preventing him from making his defense. He complains that he was left with no way to respond to the prosecutor's query in closing argument, "Who else could it be? Who else could it be? No one. No one." RP (Feb. 13, 2008) at 3819. And the prosecutor's additional statement in closing, "No other reasonable, logical explanation as to who killed the Ulrich[s] but the defendant." *Id.* at 3838.

51

Unlike in *Stever*, Mr. Hilton did not seek to present a third party perpetrator theory. But even if he had, unlike the offer of proof in *Stever*, he fails to present relevant and reliable evidence to support a defense that Lisa Ulrich was the killer. Moreover, Mr. Hilton was also fully able to argue his alibi defense, albeit unsuccessfully.

Mr. Hilton also cites *Kyles v. Whitely*, 514 U.S. at 442 n.13, as instructive for the concept that the State's withholding of material exculpatory evidence in violation of *Brady* deprived him of the chance to further underscore through cross-examination that Lisa Ulrich was the killer. But as discussed, the State did not commit a *Brady* violation because it did not withhold material exculpatory evidence pertaining to the Ulrichs' computer—much less evidence pointing to Lisa Ulrich as the perpetrator.

Finally, citing to *United States v. Vallejo*, 237 F.3d 1008, *amended by* 246 F.3d 1150 (9th Cir. 2001), Mr. Hilton contends that in the direct appeal, this court failed to recognize it is the role of the jury to consider the relative weight of the evidence against Lisa Ulrich and determine whether it presents legitimate alternative theories for how the crime occurred.

In *Vallejo*, the defendant was charged with importing marijuana hidden in compartments of his recently purchased car. He denied knowledge of the drugs. The trial court excluded his proffered evidence that the still registered former owner of the car had a month earlier been arrested, and since convicted and deported, for bringing a similar amount of marijuana across the border, at the same port of entry, using the same

method of concealment, but in a different car. *Vallejo*, 237 F.3d at 1022-23. On appeal, the court held the exclusion of this evidence of third party culpability was an abuse of discretion because "the similarity of circumstances surrounding [the former owner's] arrest provid[ed] an alternative theory of how the drugs were secreted in Vallejo's car without his knowledge," and had "unique relevance to the central defense theory that Vallejo did not know of the drugs in the car." *Id.* at 1023. The court further explained that exclusion of the evidence precluded him from answering the question by jurors: "If defendant did not know there were drugs in the car and did not place them there himself, who did?" *Id.* at 1023.

> In arriving at its decision, the *Vallejo* court quoted from Professor Wigmore:

> [I]f the evidence [that someone else committed the crime] is in truth calculated to cause the jury to doubt, the court should not attempt to decide for the jury that this doubt is purely speculative and fantastic but should afford the accused every opportunity to create that doubt.

*Id.* at 1023 (alterations in original) (quoting 1A JOHN HENRY WIGMORE, EVIDENCE IN TRIALS AT COMMON LAW § 139 (Tillers rev. ed. 1983)). The *Vallejo* court continued:

> Accordingly, it is the role of the jury to consider the evidence and determine whether it presents "all kinds of fantasy possibilities," as the district court concluded, or whether it presents legitimate alternative theories for how the crime occurred.

*Id.* at 1023.

Mr. Hilton seizes upon this reasoning to contend all of his evidence pertaining to Lisa Ulrich is admissible on a third party perpetrator theory and the court erred in

refusing to allow it. But besides his previous waiver of the issue already confirmed in the direct appeal, he also overlooks the context of *Vallejo*, where the third party perpetrator evidence was admissible because it was directly probative of Vallejos' culpability for the crime. *Id.* As this court held in the appeal, Mr. Hilton proffered no such evidence in the trial court. Nor does he point to any alleged third party perpetrator evidence in this petition that warrants consideration by a jury. *Vallejo* (with its reliance on *Wigmore*) is not helpful to Mr. Hilton.

Mr. Hilton makes no showing that the interests of justice require us to further revisit his third party perpetrator issue—either on his alleged lack of waiver or the merits of the claim. *Gentry*, 137 Wn.2d at 388. We decline to do so and reject his ground 4 arguments. We also reject the additional extensive attempts by Mr. Hilton (and the State) in their briefing to rehash trial evidence already weighed by the jury and purported third party perpetrator evidence already ruled not relevant to that theory.

Referring back to the ineffective assistance claim in ground 3, given the lack of relevant admissible third party perpetrator evidence, Mr. Hilton cannot show prejudice by any performance or omissions of counsel under the *Strickland* standards with respect to the Lisa Ulrich third party perpetrator issue. We, thus, likewise reject his ground 3 ineffective assistance of counsel argument for failure to meet his burden under *Strickland* and *Cook*.

54

In light of our holdings rejecting each of Mr. Hilton's four grounds for relief, we also deny his motion to disqualify Benton County Prosecutor Andrew Miller and his office from this matter, and his motion for discovery and an evidentiary hearing. Both motions are premised on the State's alleged possession of evidence that contradicted its theory presented at trial to convict Mr. Hilton, that it withheld *Brady* evidence, and that it knowingly made false statements to the court. Mr. Hilton asserts these matters present "newly discovered evidence not available to the defense at the time of trial," that requires Mr. Miller and members of his office who were involved in this case to submit written statements or appear as witnesses in reference proceedings to respond to the factual allegations of the State's own experts from its investigation. Mot. for Disc. and Evidentiary Hr'g at 1-2; Mot. to Disqualify Prosecutor at 1-2. Mr. Hilton further states that witnesses who have already voluntarily provided statements may, under direct questioning, have additional material evidence to support his claims. He also suggests that this court require the State to admit or deny specific allegations raised by his evidence. RAP 16.9(b). Mot. for Disc. and Evidentiary Hr'g at 2.

First, to obtain an evidentiary hearing, "the petitioner must demonstrate that he has competent, admissible evidence to establish the facts that entitle him to relief." *Rice*, 118 Wn.2d at 886. The petitioner's factual allegations must be "based on more than speculation, conjecture, or inadmissible hearsay." *Id.*

55

Mr. Hilton fails this burden. He has produced no prima facie facts that entitle him to relief—only speculation, conjecture, or innuendo that is not evidence sufficient to command reference proceedings or necessitate further response from the State. The purpose of an evidentiary hearing is to resolve genuine factual disputes, not to determine whether the petitioner actually has evidence to support his allegations. *Id.* Mr. Hilton fails to show that an evidentiary hearing—or discovery for what is in essence a fishing expedition—is warranted here. These circumstances likewise render his motion for disqualification unsupportable and without merit. Both of his motions are denied.

Mr. Hilton makes no claim entitling him to relief in a personal restraint petition. He fails his burden under *Cook* and *Rice*.

The petition is dismissed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

Siddoway, C.J.

WE CONCUR:

Brown, J.

Korsmo, J.